UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
01 NOV 13 PM 2:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| RHONDA HARRISON, ) | |
| Plaintiff, ) | |
| vs. ) | Civil Action No. CV-99-S-3353-NE |
| SY TECHNOLOGY, ) | ENTERED |
| Defendant. ) | NOV 13 2001 |

## MEMORANDUM OPINION

Plaintiff, Rhonda Harrison, was relieved of supervisory duties by her employer, SY Technology, in November of 1998, prior to taking maternity leave for the birth of her second child. Her supervisory duties were transferred to a male employee. This transfer became permanent in March of 1999, upon plaintiff's return from maternity leave, when she was formally demoted by defendant. Plaintiff contends that defendant discriminated against her on the basis of her gender and her pregnancy, and thus has violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, and the Family and Medical Leave Act of 1993, as amended, 29 U.S.C. §§ 2601-2619. The action presently is before the court on defendant's motion for summary judgment. Upon consideration of the pleadings, evidentiary submissions, and briefs, this court concludes the motion is due to be denied.

### I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 permits any party to a civil action to move for summary judgment upon a claim, cross-claim, or counterclaim on which there is no genuine issue of material fact, and upon which the moving party is entitled to prevail as a matter of law.

> The judgment sought *shall be rendered forthwith if* the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

> show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c) (emphasis supplied). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See, e.g., Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The movant discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the opposing party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*).

When deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-moving party, and to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).

When the moving party has discharged its burden, the opposing party must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d

2

at 593. The non-moving party must put forth more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

## II. STATEMENT OF FACTS

Plaintiff Rhonda Harrison was an employee in the government contracting department in the Huntsville, Alabama office of SY Technology ("SY") from November of 1995 until April 30, 1999, when she resigned her position. Plaintiff had six years of government contract management and administration experience when she was hired by SY in 1995.[1] She was promoted in June of 1997 to be Director of Contracts, a position that entailed supervisory authority over the government contracting department — including contract proposals, modifications, contract preparation, and negotiation. She also was responsible for approving the time sheets of, and for discipline of, seven full-time employees.[2] She had a personal secretary, Cindy Stanford.[3]

---

[1] Plaintiff's Brief in Opposition at 4.
[2] *Id.*; *see also* Plaintiff's evidentiary submission, Tab A (Harrison deposition), at 60, 89.
[3] Plaintiff's Brief in Opposition at 5.

3

Prior to her promotion as Director of Contracts, plaintiff had taken maternity leave in August of 1996, to give birth to her first child. Plaintiff again became pregnant in 1998; her responsibilities had increased significantly since her first maternity leave in 1996, but plaintiff informed defendant that she planned to work until immediately prior to her child's birth.[4] In October of 1998, however, plaintiff was notified by her supervisor and SY Chief Operating Officer, Alan Sherer ("Sherer"), that he was transferring her duties to a male employee in her department, Stan Stanford.[5] Sherer attributed this decision to plaintiff's pregnancy, although plaintiff claims that she was not having any pregnancy-related problems.[6] Sherer notified the contracts department of this change by e-mail on November 16, 1998.[7]

Plaintiff took her maternity leave in January of 1999, and returned on or about March 8, 1999.[8] Once plaintiff returned to work, Sherer informed her that Stan Stanford would continue to perform plaintiff's Director of Contracts duties,[9] and that she had been demoted to a contracts administrator position.[10] She was directed to move from her office into a cubicle with her former secretary, Cindy Stanford.

On March 17, 1999, SY notified its employees that it was reorganizing its contracts department.[11] Stan Stanford was named "Interim Manager of Corporate Contracts."[12] According

---

[4] Plaintiff's evidentiary submission, Tab A (Harrison deposition), at 93-94.
[5] *Id.* at 95.
[6] *Id.*
[7] *See* Defendant's Exhibit 1 to Harrison deposition.
[8] *Id.* at 96, 130.
[9] *Id.* at 130.
[10] *Id.* at 142.
[11] *Id.* at 164-65 ; *see also id.*, Tab B (Sherer deposition), Exhibit 10.
[12] *Id.*, Tab B (Sherer deposition), at 184-85; *see also id.*, Tab A (Harrison deposition), at 170-71.

4

to Sherer, the new position entailed Stan Stanford's oversight of contracts administrators and other personnel, including plaintiff.[13] Although plaintiff complained repeatedly about this new arrangement to Sherer, Chief Executive Officer John Shih, and SY President Jay Garner, she was nevertheless left in her new position as a contracts administrator until her resignation and eventual departure from the company on April 30, 1999.[14]

Plaintiff filed suit in this court on December 20, 1999, alleging that SY had discriminated against her on the basis of her gender and pregnancy in violation of Title VII of the Civil Rights Act of 1964 and the Family and Medical Leave Act.

## II. DISCUSSION

A.  **Plaintiff's Title VII Claim**

To prevail on a Title VII employment discrimination claim, a plaintiff must prove that the employer intended to discriminate against her on the basis of her "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In 1978, Congress added § 701(k), the "Pregnancy Discrimination Act," to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, to include "pregnancy, childbirth, or related medical conditions" in the prohibition against discrimination on the basis of an individual's sex. 42 U.S.C. § 2000e(k) (1994); *see also Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000); *Byrd v. Lakeshore Hospital*, 30 F.3d 1380, 1382 (11th Cir. 1994).

Three forms of proof may be used to establish an employer's intent to discriminate in a Title VII case: (1) statistical evidence of a pattern of discrimination;[15] (2) direct evidence of a

---

[13] *Id.*, Tab B (Sherer deposition), at 184.
[14] Plaintiff's Brief in Opposition at 15.
[15] *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997).

5

discriminatory animus;[16] or (3) circumstantial evidence. The evaluation of the sufficiency of a plaintiff's proof of the employer's intent differs, depending upon which form is used. Regardless of the form employed, however, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

Plaintiff offers both direct and circumstantial evidence to support her claim that defendant discriminated against her because of her pregnancy and, thus on the basis of her sex. "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (internal quotation marks omitted) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n. 6 (11th Cir.1987)). Only the most blatant remarks indicating a discriminatory animus constitute direct evidence. *See, e.g., Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999); *Wright v. Southland Corporation*, 187 F.3d 1287, 1293-1303 (11th Cir. 1999). Further, direct evidence includes "[o]nly statements by the person involved in the decisionmaking process," *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1105 (11th Cir. 2001); *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998) ("A statement by a person who played no part in the adverse personnel decision is not direct evidence of discrimination."). Thus, direct evidence does not include "stray remarks in the workplace," "statements by nondecisionmakers," or "statements by decisionmakers unrelated to the decisional process." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 1804-05, 104 L.Ed.2d

---

[16] *See, e.g., Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989).

268 (1989) (O'Connor, J., concurring); *see also, e.g., Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (same). In summary, "[t]o amount to direct evidence, a statement must: (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus." *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).

Although plaintiff had served as Director of Contracts for SY's contracting department since June of 1997, she contends that she was "stripped of all supervisory authority in November 1998 due to 'perceived problems' with her pregnancy."[17] According to plaintiff, Alan Sherer "brought me into his office ... and *said because of my condition he was going to put Stan Stanford in that position, Director of Contracts*."[18] Plaintiff also points to an e-mail message Sherer sent on November 16, 1998, to all employees in the contracts department. Plaintiff then was approximately six months pregnant. The e-mail message read:

> Effective immediately (16 November 1998), Stan Stanford will now be your point of contact for all day-to-day Contract duties and concerns.
>
> *Rhonda Harrison is continuing to have health problems associated with her pregnancy.* She does not, at this time, need the pressure and stress of day-to-day duties *associated with her present condition* in the Contracts Department.
>
> Please direct all concerns to Stan Stanford at the Huntsville Site.
>
> ...
>
> Thanks, Alan [Sherer][19]

Plaintiff argues that this message "makes it abundantly clear that her pregnancy was the sole reason

---

[17] Plaintiff's Brief in Opposition at 26.

[18] *Id.* at 92 (emphasis supplied).

[19] Defendant's Exhibit 1 to Harrison deposition (emphasis supplied).

for [Sherer's] decision to divert all of her supervisory responsibilities to Stanford, a male employee, who admits he had previously taken direction from the Plaintiff."[20] In response, defendant argues that, "*[a]s a result of the perception that plaintiff was having difficulties with her pregnancy, Alan Sherer decided to lighten her workload and transfer her managerial responsibilities to Mr. Stan Stanford* in November or December of 1998."[21]

Plaintiff has offered other evidence to show that defendant's decision to relieve her of her supervisory duties was made on the assumption that she was experiencing difficulty with her pregnancy. According to plaintiff, Sherer explained that he assumed she was having difficulties with her pregnancy after he was approached by another employee in the office. Although unable to remember the employee's identity, Sherer said that he "was told by someone that [plaintiff] was having contractions, false labor, and bleeding."[22] When asked, however, if "[a]t any point in time ... Rhonda Harrison provide[d] [Sherer] with any type of doctor's excuse or restrictions concerning her pregnancy," he responded that he "d[idn]'t think so," although he could not remember for certain.[23] Sherer admitted that *plaintiff* had never told him that she needed to reduce the stress and pressure of her daily working environment, despite his statement to that effect in his November 16, 1998 e-mail to SY employees.[24] In fact, plaintiff testified in deposition that:

> Q.   In the second paragraph [of the November 16, 1998 e-mail from Alan Sherer] where it says "Rhonda Harrison is continuing to have health problems associated with her pregnancy," what were those health problems?
>
> A.   I don't know. I didn't have any problems with my pregnancy.

---

[20] Plaintiff's Brief in Opposition at 26-27.

[21] Memorandum Brief in Support of Defendant's Motion at 3.

[22] *Id.*, Tab B (Sherer deposition), at 207.

[23] *Id.* at 208.

[24] *Id.*

8

> Q. Had you told Alan [Sherer] that you were having problems?
>
> A. No. I was tired. You know, there would be at the end of the day sometimes I would be tired.
>
> Q. Were you able during your pregnancy to function the same as you had prior to your pregnancy?
>
> A. Yes.[25]

It appears that other SY corporate employees exhibited similarly inappropriate conduct in regard to plaintiff's pregnancy prior to Sherer's November 16, 1998 e-mail. For example, plaintiff gave birth to her first child while in defendant's employ. Approximately two to three months following her return from that maternity leave, SY Chief Executive Officer John Shih called an "all-hands" meeting of SY's Huntsville employees, at which he made a speech. Plaintiff recalled in deposition Shih's comments to the group of SY employees gathered there:

> A. ...
>
> We had an all-hands meeting.... And John [Shih] was speaking and telling everybody thanks for all their hard work, and he made a comment about, you know, our hard work on the proposals and how we had won the proposals.
>
> And *he said he had learned a lesson, you know, never to give responsibility to a pregnant woman.*
>
> Q. He was making a speech to everyone?
>
> A. Right.[26]

Plaintiff also testified in deposition that, when she became pregnant with her second child in 1998, she was forced to inform Sherer of her pregnancy sooner than she would have liked. Plaintiff was less than three months pregnant when Sherer, upon learning she had a doctor's

---

[25] Plaintiff's evidentiary submissions, Tab A (Harrison deposition), at 146.
[26] *Id.* at 110.

appointment, asked her "point blank ... 'Are you pregnant?'"[27] Once plaintiff confirmed for Sherer that she was indeed pregnant, Sherer commented, "[w]e've got to figure out who's going to do this job."[28]

As the months passed, other employees noticed that plaintiff was "treated differently because of her pregnancy."[29] Lisa Hays, a contract administrator at SY during plaintiff's tenure, explained her feeling that plaintiff was singled out because of her pregnancy.

> A. [Alan Sherer] made [plaintiff] come in once and lay on his couch and a bunch of people came around. It was a mess.
>
> Q. When was the first time that you — I'm assuming, you said you noticed her being treated differently; is that correct?
>
> A. *He would refer to her in her condition. At first it was a joke and then it became more serious and then became something that we heard weekly.*
>
> Q. When was the first time you heard him refer to her condition?
>
> A. Probably right after we found out she was pregnant.
>
> Q. What did he say?
>
> A. *Little lady's in a delicate condition.* Like I said, *at first I think it was jokes about her and her condition, being pregnant, that kind of thing*. And then it became more — the more he would say it, the bigger it became. *Then it turned to how concerned he was with her condition.*
>
> ...
>
> [D]uring high stress times he would come in and say, are you okay, you know, and that kind of thing. And it became more of an appearance that he was concerned, and then it became apparent that he was overly concerned.
>
> Q. Is there anything about his concern that made you feel like his concern was

---

[27] *Id.* at 92.

[28] *Id.*

[29] *Id.*, Tab E (Hays deposition), at 106-08.

    not genuine?

A. Yeah, once he started drawing attention to her pregnancy and the time he insisted she lay on his couch in the office.

...

Q. How did Alan [Sherer] make her lie down on his couch?

A. He just insisted. He didn't physically put her there but he just insisted that she come in, lay down; she said, no, she was fine, and he said, no, I think you need to lay down, just come on in here and lay down.[30]

This court finds that plaintiff's showing amounts to direct evidence of discriminatory animus. *See, e.g., Damon*, 196 F.3d at 1359; *Wright*, 187 F.3d at 1293-1303. Such paternalism is wholly inappropriate in the workplace, specifically and especially where a decisionmaker uses that concern to justify making an adverse employment decision about a pregnant employee. *See E.E.O.C. v. W & O, Inc.*, 213 F.3d 600, 611 (11th Cir. 2000) (affirming a jury award of punitive damages against an employer that instituted a discriminatory policy for its pregnant employees, despite the employer's claimed "benevolent" motive "to protect pregnant women and their unborn children"); *Maldonado v. U.S. Bank*, 186 F.3d 759, 767-68 (7th Cir. 1999) (citing cases) ("[T]he bank did not have specific evidence (aside from general assumptions about pregnancy) that Maldonado would require special treatment. Absent such evidence, the bank cannot terminate Maldonado simply because it 'anticipated' that she would be unable to fulfill its job expectations.").

If a plaintiff presents direct evidence that an employer acted with discriminatory motive, "and the trier of fact believes it," an "employer can avoid liability only if [it] satisfies the trier of fact by a preponderance of the evidence that the same employment decision would have been reached in the

---

[30] *Id.* at 107-111 (emphasis supplied).

absence of the discriminatory motive." *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1518 (11th Cir. 1990) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989) (plurality opinion)). The employer must "*prove* that there was a gender-neutral reason for its employment decision." *Id.*

Defendant neglects even an attempt at making this showing, however, and instead argues that plaintiff's claim should be dismissed because she cannot make out a prima facie case pursuant to the *McDonnell Douglas* balancing test applied to circumstantial evidence in Title VII discrimination cases.[31] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Defendant would be wise to note, however, that the familiar tripartite *McDonnell Douglas* test does not apply to courts' analysis of direct evidence of an employer's discrimination. *See, e.g., Burns*, 908 F.2d at 1518 (citing *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1070-71 (11th Cir. 1990)).

In the absence of proof that defendant would have demoted plaintiff from her position as Director of Contracts for a gender-neutral reason, then, this court finds that plaintiff has raised a genuine issue of material fact through direct evidence as to whether her employer discriminated against her on the basis of her gender and pregnancy in violation of Title VII. Summary judgment is denied as to this claim.

**B.      Plaintiff's Family and Medical Leave Act Claim**

The Family and Medical Leave Act of 1993 ("FMLA") provides that "an eligible employee" is entitled to "a total of 12 workweeks of leave during any 12-month period for one or more of the following: ... (A) Because of the birth of a son or daughter and in order to care for such son or

---

[31] Defendant's Brief in Support at 11-12.

12

daughter." 29 U.S.C. § 2612(a)(1)(A) (1994). A plaintiff can bring two types of claims to preserve her rights under FMLA: "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, ... and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in an activity protected by the Act." *Strickland v. Water Works and Sewer Board of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001). Plaintiff asserts both interference and retaliation claims.

### 1. Plaintiff's interference claim

Plaintiff first argues that SY interfered with, and thus denied, her FMLA right to be reinstated "to the position of employment held ... when the leave commenced; or ... to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."[32] The "central question before this court is whether [plaintiff] has raised a factual dispute as to whether [s]he qualified for a right to reinstatement under the FMLA ... and if so, whether [SY] violated that right." *Parris v. Miami Herald Publishing Co.*, 216 F.3d 1298, 1301 (11th Cir. 2000).

As a preliminary matter, defendant claims that plaintiff in fact was restored to the "same or equivalent position to that which she held prior to her FMLA leave."[33] Defendant contends also that plaintiff received the same compensation and benefits, and had the same terms and conditions for employment, once she returned to SY on approximately March 8, 1999.[34] Defendant further argues that plaintiff was not demoted, and that plaintiff's Director of Contracts position was eliminated

---

[32] Plaintiff's Brief in Opposition at 40 (quoting 29 U.S.C. § 2614(a)(1)(A)-(B)).
[33] Defendant's Brief in Support at 17.
[34] *Id.*

13

ultimately as part of a company restructuring.[35] Finally, and illogically, SY argues that "a week or two after her return from FMLA leave, SY Technology, Inc. began to implement its restructuring program"; because plaintiff was invited to apply for new supervisory positions within that restructured program she, therefore, "cannot complain that she was not returned to the same or an equivalent position as she held prior to her FMLA leave."[36]

Nevertheless, plaintiff contends that, in fact, she was permanently demoted once she returned to SY in March of 1999. When deciding whether the moving party has met its burden on summary judgment, this court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-moving party, and to resolve all reasonable doubts in that party's favor. *See Spence*, 873 F.2d at 256. This court finds plaintiff's evidence persuasive that she was demoted from,

---

[35] *Id.* at 14, 18.

[36] Defendant's Brief in Support at 17. The court finds it interesting, despite defendant's assertion that plaintiff was invited to apply for new supervisory positions, that Sherer explained that SY ultimately did not interview anyone other than Stan Stanford for the new director position that took the place of the Director of Contracts position she previously had held. In Sherer's words:

Q. Did you interview anyone else [other than Stan Stanford] for this [corporate director of contracts] position?

A. No.

Q. Did [SY Chief Executive Officer] Dr. Shih?

A. Not that I'm aware of.

Q. Why was that? Why didn't you interview anyone else?

A. I didn't believe it was required.

...

Q. Was anyone else considered?

A. No. Not that I'm aware of.

Plaintiff's evidentiary submission, Tab B (Sherer deposition), at 82-83.

and never reinstated to, the Director of Contracts position once she returned to SY in March of 1999.

For example, plaintiff testified in deposition that, on the morning she returned from maternity leave, Sherer "met [her] in [her] office door and said 'We need to talk.'"[37] Sherer told plaintiff that he was going to "leave Stan [Stanford] in th[e] [Director of Contracts] position."[38] According to plaintiff:

> [H]e said, "You're going to take direction from Stan [Stanford], and we've moved your phone and your computer back with Cindy [Stanford]." I was now sharing an office, a cubicle, with a lady that was my secretary.[39]

A few days later, plaintiff learned that Sherer "had moved Stan [Stanford] in my office, and ... me into the cube with Cindy [Stanford],"[40] plaintiff's former secretary. This was true although there was adequate office space available for everyone in the contracts department.[41]

Plaintiff also stated in deposition that her work duties had changed. Prior to the November 1998 transfer of her Director of Contracts' responsibilities, plaintiff oversaw seven contracts department employees, regularly supervised the administration of between fifteen and twenty government contracts, performed contract administration, was responsible for disciplining department employees, and approved employees' time sheets.[42] Those duties changed substantially upon her return from maternity leave in March of 1999. According to plaintiff:

> Q. You said when you got back Stan [Stanford] gave you an assignment to work on one contract.
>
> A. Correct.

---

[37] Plaintiff's evidentiary submission, Tab A (Harrison deposition), at 130.
[38] *Id.* (quotation marks omitted).
[39] *Id.*
[40] *Id.* at 134.
[41] *Id.*
[42] *Id.* at 83-84, 85, 87, 89-90.

15

> Q. Was that the only assignment you were given?
>
> A. I also worked on a proposal.
>
> Q. Other than that contract and the proposal, did you work on any other assignments before you left on April 30th?
>
> A. I'm sure I did, you know, just various little jobs here and there. But I don't remember the specifics.
>
> Q. Did other contract administrators come to you for advice?
>
> A. No.
>
> Q. Did other contract administrators ever ask you to sign their time sheets?
>
> A. I don't think so.
>
> Q. Well, did you attempt to sign their time sheets?
>
> A. Not after Alan [Sherer] demoted me.[43]

Further, on March 15, 1999, plaintiff testified that she met with Sherer and Stanford to inform them that she believed SY was in violation of FMLA, and that SY "had to return [her] to [her] same position and status, with the same benefits."[44] *When plaintiff asked Sherer if she had been demoted from the Director of Contracts position, "he said yes."*[45] According to plaintiff, Sherer also stated in that meeting that the employees she had formerly supervised were to "report to Stan [Stanford]."[46]

When an "eligible employee" like plaintiff "alleges her employer denied her FMLA right to reinstatement, the employer has an opportunity to demonstrate it would have discharged the

---

[43] *Id.* at 137-38.
[44] *Id.* at 141.
[45] *Id.* at 142.
[46] *Id.*

16

employee even had she not been on FMLA leave." *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1354 (11th Cir. 2000). This means that an "employer must be able to show than an employee *would not otherwise have been employed at the time reinstatement is requested* in order to deny restoration to employment." *Id.* (emphasis supplied). This, defendant is unable to do.

For example, before plaintiff left for maternity leave, she held the title of Director of Contracts for SY, even though her duties had been reassigned in November of 1998 to Stan Stanford. Plaintiff testified that she was led to believe that this reassignment was temporary, and that she would be returned to her supervisory status once she returned from maternity leave.[47] When she returned from maternity leave in March of 1999, however, Alan Sherer, plaintiff's supervisor, informed her that he had decided to leave Stanford in the Director of Contracts position, and that she had been demoted.[48] Plaintiff no longer performed most — if any — of the duties of her previous supervisory position,[49] and those she continued to perform were from the confines of a shared cubicle, rather than the private office Stanford now occupied.[50]

Defendant correctly observes that an "employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."[51] *Parris*, 216 F.3d at 1302. Defendant argues that it began the process of restructuring plaintiff's department soon after she returned from maternity leave in March of 1999,[52] but fails to demonstrate that plaintiff's position was slated to be eliminated prior to her

---

[47] Plaintiff's evidentiary submission, Tab A (Harrison deposition), at 106-07.

[48] *See supra* text accompanying note 45.

[49] *See supra* text accompanying note 43.

[50] *See supra* text accompanying note 39-40.

[51] Defendant's Brief in Support at 18.

[52] *Id.*

17

FMLA leave. *See id.* Defendant makes no argument that it would have demoted plaintiff even if she had not been on FMLA leave. *See O'Connor*, 200 F.3d at 1354. Defendant instead states that Stan Stanford remained in plaintiff's Director of Contracts position "in an effort not to destroy the continuity which was developed while the plaintiff was on FMLA leave,"[53] and that "Stan Stanford continued to serve in [plaintiff]'s capacity [as Director of Contracts] even after her return from FMLA leave simply to ensure a smooth transition in the plaintiff's return to work and to ensure that the large projects were timely completed."[54] These facts are not sufficient to enable defendant to prove that it would have demoted plaintiff even had she not taken FMLA leave. Consequently, this court finds that plaintiff has raised a genuine issue of material fact on this claim, and that summary judgment is inappropriate.

### 2.    Plaintiff's retaliation claim

Plaintiff also argues that SY's failure to reinstate her to the Director of Contracts position upon her return from maternity leave constitutes impermissible retaliation under FMLA. To succeed on her retaliation claim, plaintiff must "demonstrate that [her] employer intentionally discriminated against [her] in the form of an adverse employment action for having exercised a FMLA right." *Strickland*, 239 F.3d at 1207. As the *Strickland* Court explained, "a plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Id.* (quotation marks and citations omitted). This showing can be made either with direct or circumstantial evidence. *See id.* This court has already found that plaintiff has made a sufficient showing of direct evidence of discrimination by

---

[53] *Id.* at 17.
[54] Defendant's Brief in Support at 13.

18

her employer to warrant a denial of summary judgment on her Title VII claim, and that discussion compels the same conclusion here.[55]

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is due to be denied in all respects. An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this 13th day of November, 2001.

_____
United States District Judge

---

[55] *See supra* Part II.A.